**In re SUBURBAN MOTOR FREIGHT, INC., Debtor.**

**OHIO BUREAU OF WORKERS' COMPENSATION, Plaintiff–Appellant,**

v.

**Stephen K. YODER, Trustee for Suburban Motor Freight, Inc., Defendant–Appellee.**

No. 93–3920.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 8, 1994.

Decided Sept. 21, 1994.

Gregory S. Severance (argued and briefed), Ohio Atty. Gen., Columbus, OH, Larry Rhodebeck (briefed), Ohio Bureau of Workers' Compensation, Columbus, OH, for plaintiff-appellant.

Quintin F. Lindsmith, Harry Wright, IV (argued and briefed), Bricker & Eckler, Columbus, OH, for defendant-appellee.

Before JONES and BATCHELDER, Circuit Judges; and JOINER, District Judge.[*]

JOINER, District Judge.

Plaintiff, the Ohio Bureau of Workers' Compensation, is again before this court seeking priority status under the Bankruptcy Code for its claim against Suburban Motor Freight, Inc., arising out of Suburban's non-compliance with Ohio's workers' compensation law. We previously held that the Bureau's claim for unpaid premiums was entitled to priority as an excise tax under 11 U.S.C. § 507(a)(7)(E). *Yoder v. Ohio Bureau of Workers' Compensation (In re Suburban Motor Freight, Inc.)*, 998 F.2d 338 (6th Cir.1993) ("*Suburban I*"). In this case, the Bureau's claim against Suburban is for reimbursement of the payments made to workers' compensation claimants, necessitated by Suburban's failure to pay premiums when it was a participant in the Ohio workers' compensation fund, and its failure to pay on claims which arose when it was a self-insured employer. Both the bankruptcy court and the district court on appeal denied priority status to the Bureau's claim. We affirm.

## I.

At all times pertinent to this case,[1] an Ohio employer could comply with Ohio's workers' compensation law in one of two ways: (1) by paying premiums and thereby participating in the state fund, Ohio Rev.Code Ann. § 4123.35(A); or (2) by self-insuring under a privilege granted by the Industrial Commission of Ohio, Ohio Rev.Code Ann. § 4123.-35(B). A self-insured employer was required to post a bond sufficient to secure the payment of benefits to employees. Ohio Rev. Code Ann. § 4123.35(C).

Employees of both state fund and self-insured employers are entitled to the same benefits. Failure to pay premiums, in the case of a state fund employer, and failure to pay claims directly, in the case of a self-insured employer, results in "noncompliance." Claimants against either type of noncompliant employer may continue to file claims and be paid from the state's surplus fund. Ohio Rev.Code Ann. § 4123.75. The surplus fund was created by statute, and funded by crediting to it a portion of the premiums paid by compliant employers into the state insurance fund. Ohio Rev.Code Ann. § 4123.34. If a claimant secures payment from the surplus fund, the Bureau of Workers' Compensation turns to the noncompliant employer for reimbursement of the claims payments. Ohio Rev.Code Ann. § 4123.75. Ohio law requires the Bureau to attempt to collect from state fund employers both unpaid premiums and the actual claims payments. Ohio Rev.Code Ann. §§ 4123.37, 4123.75. The effect of this requirement is lessened to an extent by section 4123.75, which grants a partial credit for premiums recovered by the Bureau.

Suburban was self-insured from November 1967 to August 1983, a period during which 200 claims were filed. Suburban continued

[*] The Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation.

1. Ohio's workers' compensation law has experienced substantial revision in recent years, and the discussion in the text pertains to Ohio's law as it existed during the period relevant to this case.

to pay on these claims until it filed its bankruptcy petition in February 1987. Suburban was a state fund participant after August 1983. Lapses in Suburban's state fund coverage occurred in 1986 and 1987, and eight compensation claims arose during this time. Between March 1987 and the end of 1991, the state paid over $1.2 million to claimants, most of which was attributable to Suburban's default on its self-insured obligations. The Bureau's total claim exceeded $2.5 million, because it included future payments on these claims. The parties agreed that the claim should be reduced by certain accrued expenses and payments in excess of $1.7 million from sureties on bonds that Suburban had posted to obtain self-insured status. Through payments made on Suburban's behalf by the state and by sureties, all legitimate workers' compensation claims will be paid, and no claimants will be adversely affected by Suburban's bankruptcy.

Before the bankruptcy court, the Bureau argued that its claim was entitled to priority under two distinct subsections of 11 U.S.C. § 507(a)(7):

**Priorities**

(a) The following expenses and claims have priority in the following order:

. . . .

(7) Seventh, allowed unsecured claims of governmental units, only to the extent that such claims are for—

. . . .

(E) an excise tax. . . .

. . . or

(G) a penalty related to a claim of a kind specified in this paragraph and in compensation for actual pecuniary loss.

The bankruptcy court rejected both arguments. With respect to § 507(a)(7)(E), the bankruptcy court concluded that the Bureau's claim did not have sufficient tax characteristics to be considered an excise tax, relying on *In re Payne*, 27 B.R. 809, 817 (Bankr.D. Kan.1983) (state's claim against noncomplying employer for workers' compensation claims payments not entitled to § 507(a)(7)(E) priority; claim had substantial non-tax characteristics and resembled assignment of or subrogation to tort claim). With

respect to § 507(a)(7)(G), the bankruptcy court held that priority as a pecuniary loss penalty requires that the claim be related to a tax, be penal in nature, and be compensatory and not punitive. The Bureau's claim arising out of Suburban's default as a self-insured employer failed because it did not *relate* to a tax under § 507(a)(7), and the Bureau's claim arising out of Suburban's default as a state fund participant failed because it was punitive rather than compensatory, in light of Suburban's dual liability for both unpaid premiums and reimbursement for payments made to claimants.

The district court affirmed the bankruptcy court's judgment, relying in part on this court's opinion in *Suburban I*, decided after the bankruptcy court had ruled.

## II.

In deciding the issues presented by this case, we remain mindful of the admonition that "[e]quality of distribution among creditors is a central policy of the Bankruptcy Code." *Begier v. Internal Revenue Serv.*, 496 U.S. 53, 58, 110 S.Ct. 2258, 2263, 110 L.Ed.2d 46 (1990). Thus, priority claims must be carefully limited since every such claim reduces the fund available to general creditors. For this reason, "creditors must directly tie their priority claims to specific provisions of the Bankruptcy Code." *Suburban I*, 998 F.2d at 342.

### A. Priority Under § 507(a)(7)(E) as Excise Tax

Whether an obligation is a tax within the meaning of the Bankruptcy Code is determined by federal law. *New York v. Feiring*, 313 U.S. 283, 285, 61 S.Ct. 1028, 1029, 85 L.Ed. 1333 (1941); *Suburban I*, 998 F.2d at 339 n. 2. The Supreme Court has defined taxes as "those pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it." *Feiring*, 313 U.S. at 285, 61 S.Ct. at 1029. The Bureau asks us to extend the holding in *Suburban I*, which accorded priority status to its claim for unpaid workers' compensation premiums, to its

claim for reimbursement of claims payments made by the Bureau due to Suburban's default as both a self-insured employer and a state fund participant. We decline to do so, and find that the rationale of *Suburban I* does not support such an expansive reading of § 507(a)(7)(E).[2]

*Suburban I* observed that the priority status of a claim for premiums generally is held to depend upon whether an individual state's program is monopolistic (such as Ohio's) or whether the state system merely competes with private insurers.

> The theory goes that where the State has intended to supplant all private forms of workers' compensation insurance, to centralize the system and to force all employers to participate on pain of legal sanctions, *the coercive and universal nature of the state program makes payments it collects more akin to taxes than to fees or insurance premiums, which are paid voluntarily.*

*Id.* at 340 (emphasis added).

The court reviewed the four-part test derived from *County Sanitation District v. Lorber Industries of California (In re Lorber Industries of California)*, 675 F.2d 1062, 1066 (9th Cir.1982), requiring that a tax be (1) an involuntary pecuniary burden; (2) imposed by the state legislature; (3) for a public purpose; (4) under the police or taxing power of the state. *Suburban I* noted that the test, in particular its "public purpose" requirement, did not limit in any meaningful way the circumstances under which government claims would be entitled to priority. "[A]ll money collected by the Government goes toward defraying its expenses, and is used for public purposes. The threat of the *Lorber* reasoning, then, is that the Government automatically wins priority for all money any debtor owes it, regardless of the nature of the payments." *Suburban I*, 998 F.2d at 341 (footnote omitted).

The court elected to follow the approach of *New Neighborhoods, Inc. v. West Virginia*

*Workers' Compensation Fund*, 886 F.2d 714 (4th Cir.1989), awarding § 507(a)(7)(E) priority status to West Virginia's claim against the debtor for unpaid compensation premiums. Noting that the Ohio compensation system, like West Virginia's, is monopolistic and mandatory, the court held that where "a State 'compel[s] the payment' of 'involuntary exactions, regardless of name,' and where such payment is universally applicable to similarly situated persons or firms, these payments are taxes for bankruptcy purposes." *Suburban I*, 998 F.2d at 342 (quoting *New Neighborhoods*, 886 F.2d at 718–19). The court added a caveat, however:

> In the case at bar, we recognize the public purpose of the workers' compensation premiums in the proper context in holding that they are entitled to priority in bankruptcy; since the Ohio system is centralized and universal, "injured employees . . . depend upon the financial soundness of the [Workers' Compensation] Fund. . . ." *If the State had an optional participation program, or allowed employers to purchase private liability insurance, it would be unfair and without statutory justification to call state-collected premiums "taxes" and put the Bureau ahead in line while leaving unpaid private insurers to languish along with the rest of the unsecured creditors.*

*Id.* (citation omitted; emphasis added).

■ Thus, while satisfaction of the *Lorber* test is necessary to qualify a government claim for priority treatment as an excise tax, it is not sufficient under the reasoning of *Suburban I*. Two additional concerns emerge from that decision: (1) that the pecuniary obligation be universally applicable to similarly situated entities; and (2) that according priority treatment to the government claim not disadvantage private creditors with like claims. These additional criteria, in effect, refine the public purpose test employed in *Lorber*. The universality requirement ensures that the financial exaction's burden and

---

**2.** If the Bureau's characterization of its claim as a "tax" has any validity, it must be as an excise tax, since the payments sought are not directly assessed against persons or property, but are indirectly assessed based upon Suburban's

"transaction or act of employing." *Suburban I*, 998 F.2d at 340 n. 3 (quoting *New Neighborhoods, Inc. v. West Virginia Workers' Compensation Fund*, 886 F.2d 714, 719 (4th Cir.1989)).

benefit inure to the general public welfare, and that it not provide a discrete benefit to, or result from privileges claimed by, the payor.[3] Similarly, when a state allows the payment of mandated services through private sources (e.g., bonded self-insurance), its claim that the public welfare depends on the financial soundness of its own funding system for making the very same payments is diluted. Insistence that private creditors with like claims not be disadvantaged by according priority to the state's claim simply recognizes this fact.

■ Application of the rationale and criteria of *Suburban I* requires that the Bureau's priority claim be rejected. If Suburban, during the time that it was a state fund participant, had paid its workers' compensation premiums, it would not have incurred any additional liability for reimbursement for claims payments made on its behalf. Suburban's liability arises solely by virtue of its default, and is not a liability "universally applicable to similarly situated persons or firms." The benefit resulting from Suburban's liability for these claims payments is not one inuring to the public generally, and Suburban's liability is a penalty discretely imposed due to its disregard of its statutory obligations. This lack of universality prevents the Bureau's claim from being accorded priority treatment.

The Bureau's claim arising out of Suburban's default as a self-insured employer fails for an independent reason. As noted, the Bureau's claim against Suburban initially totalled more than $2.5 million. This amount was reduced by $1.7 million in payments from sureties that issued bonds so that Suburban could be self-insured. Thus, two types of entities have satisfied Suburban's compensation claims, the sureties and the surplus fund. Both seek reimbursement from Suburban, competing for a share of the funds available for distribution. Allowance of priority status to only the surplus fund would leave "unpaid private insurers to languish along with the rest of the unsecured creditors," a result which would be "unfair and

without statutory justification." *Suburban I*, 998 F.2d at 342.

In sum, the non-tax characteristics of Suburban's liability for reimbursement for claims payments predominate over its tax characteristics, and the Bureau's claim more closely resembles a subrogation claim than a universally applicable tax. We hold that the Bureau's claim does not fit within the narrow rationale articulated in *Suburban I* for affording priority status to a purported excise tax, and accordingly affirm the denial of priority status.

**B. Priority Under § 507(a)(7)(G) as Pecuniary Loss Penalty**

■ In order to qualify for priority under § 507(a)(7)(G), the financial exaction must (1) relate to a tax; (2) be penal in nature; and (3) be compensatory for actual pecuniary loss rather than punitive. *Compare Jones v. United States (Matter of Garcia)*, 955 F.2d 16, 18 (5th Cir.1992) (claim for interest on unpaid tax entitled to subparagraph (G) priority, as it compensated government for loss of use of money), *with In re New England Carpet Co.*, 26 B.R. 934, 936–37 (Bankr.D. Vt.1983) (tax penalties not shown to be compensatory and not entitled to subparagraph (G) priority).

■ The Bureau's claim arising out of Suburban's default as a self-insured employer is not *related* to a claim for a tax, as required by § 507(a)(7), because no premiums were due when Suburban was self-insured. The Bureau nonetheless insists that it is entitled to priority because Suburban was liable for other workers' compensation assessments during the period in which it was self-insured. However, the Bureau admits that Suburban paid these assessments and that they are not the subject of any proof of claim filed in the bankruptcy. The Bureau has failed to demonstrate how its present claim for reimbursement of claims payments "relates" to these assessments for purposes of § 507(a)(7)(G), and its priority

---

**3.** *See Spiers v. Ohio Dep't of Natural Resources (In re Jenny Lynn Mining Co.)*, 780 F.2d 585 (6th Cir.), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986); *United States v. River Coal Co.*, 748 F.2d 1103 (6th Cir.1984).

490

claim fails. *In re Chateaugay Corp.*, 153 B.R. 632, 641 (Bankr.S.D.N.Y.1993).

The Bureau's claim arising out of Suburban's default as a state fund participant undeniably relates to a tax (premiums) and is penal in nature. However, the state's imposition of liability on Suburban is punitive rather than compensatory, and its claim therefore is not entitled to priority status. Suburban's default as a state-fund participant has resulted in Suburban's liability for both unpaid premiums *and* reimbursement for claims payments made out of the surplus fund. If Suburban had paid its premiums, it would not have faced any additional liability whatsoever. An employer's workers' compensation premiums are calculated with respect to its work force and claims history. While the Bureau invites us to focus on the fact that the claims payments were made from the surplus fund, rather than the state insurance fund into which premiums are paid, we note that the surplus fund is itself funded by crediting amounts to it from payments made to the state fund which are made by complying employers. We thus find no basis for concluding that the state has not been made whole through its award for past-due premiums. Even the Bureau concedes that substantial justice has been achieved in this case by virtue of the priority status accorded to its claim for premiums for the period of default,[4] tacitly acknowledging that its liability for claims payments is punitive rather than compensatory in nature. The Bureau's priority claim arising out of Suburban's default as a state fund participant thus fails.

**AFFIRMED.**

---

4. The Bureau's principal concern appears to be that a case might arise in which the state would not be made whole through attempting to collect past due premiums, where, e.g., the employer's premium liability could not be calculated due to lost or incomplete records. We leave resolution of that hypothetical situation to a proper court at the proper time.